**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

Mary Jackson

     v.                                        Civil No. 18-cv-01000-JL
                                                Opinion No. 2019 DNH 093
Nancy A. Berryhill, Acting
Commissioner, Social
Security Administration


# O R D E R

Mary Jackson moves to reverse the decision of the Acting
Commissioner of the Social Security Administration ("SSA") to
deny her application for Social Security disability insurance
benefits, or DIB, under Title II of the Social Security Act, 42
U.S.C. § 423.  The Acting Commissioner, in turn, moves for an
order affirming her decision.  For the reasons that follow, this
matter is remanded to the Acting Commissioner for further
proceedings.


## I. Scope of Review

The scope of judicial review of the Acting Commissioner's
decision is as follows:

> The [district] court shall have power to enter, upon
> the pleadings and transcript of the record, a judgment
> affirming, modifying, or reversing the decision of the
> Commissioner of Social Security, with or without
> remanding the cause for a rehearing.  The findings of
> the Commissioner of Social Security as to any fact, if
> supported by substantial evidence, shall be conclusive
> . . . .

1

42 U.S.C. § 405(g).  However, the court "must uphold a denial of social security disability benefits unless 'the [Acting Commissioner] has committed a legal or factual error in evaluating a particular claim.'"  Manso-Pizarro v. Sec'y of HHS, 76 F.3d 15, 16 (1st Cir. 1996) (per curiam) (quoting Sullivan v. Hudson, 490 U.S. 877, 885 (1989)).

As for the standard of review that applies when an applicant claims that an SSA adjudicator made a factual error,

> [s]ubstantial-evidence review is more deferential than it might sound to the lay ear:  though certainly "more than a scintilla" of evidence is required to meet the benchmark, a preponderance of evidence is not.  Bath Iron Works Corp. v. U.S. Dep't of Labor, 336 F.3d 51, 56 (1st Cir. 2003) (internal quotation marks omitted).  Rather, "[a court] must uphold the [Acting Commissioner's] findings . . . if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [her] conclusion."  Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981) (per curiam).

Purdy v. Berryhill, 887 F.3d 7, 13 (1st Cir. 2018).

In addition, "'the drawing of permissible inference from evidentiary facts [is] the prime responsibility of the [Acting Commissioner],' and 'the resolution of conflicts in the evidence and the determination of the ultimate question of disability is for [her], not for the doctors or for the courts.'"  Id. (quoting Rodriguez, 647 F.2d at 222).  Thus, the court "must uphold the [Acting Commissioner's] conclusion, even if the record arguably could justify a different conclusion, so long as

it is supported by substantial evidence." [Tsarelka v. Sec'y of](#) [HHS,](#) [842 F.2d 529, 535 (1st Cir. 1988)](#) (per curiam).

## II. Background

Jackson was born in 1969. She has held several positions in the medical field. In 2012, while working as an emergency-room technician, she suffered an on-the-job back injury for which she filed a workers' compensation claim that was settled. Jackson's last job was as a medical assistant, and she held that position until October 30, 2015.

Jackson has received treatment for her back condition ever since her injury in 2012. In November of 2016, she saw Dr. Stephen Holman of the Seacoast Pain Institute of New England ("SPINE"), who diagnosed her with spondylosis of the lumbar region without myelopathy or radiculopathy.[1] He scheduled her for radiofrequency lesioning of the medial branches. In a progress note documenting a subsequent visit to SPINE, on March 8, 2017, physician's assistant ("PA") Shelly Landry reported:

> The lower back pain occurs constant[ly], during activities, during lifting, when bending. . . . Pain

---

[1] Spondylosis is "[a]nkylosis of the vertebra; often applied nonspecifically to any lesion of the spine of a degenerative nature." Stedman's Medical Dictionary 1813 (28th ed. 2006). Ankylosis is "[s]tiffening or fixation of a joint as a result of a disease process, with fibrous or bony union across the joint; fusion." Id. at 95. Myelopathy is a "[d]isorder of the spinal cord." Id. at 1270. Radiculopathy is a "[d]isorder of the spinal nerve roots." Id. at 1622.

[is] made better by heat, body pillow. Pain [is] made
worse by bending, twisting, physical activities over
30 minutes. Prior treatment caudal epidural steroid
injection helped, Physical Therapy/[Occupational
Therapy], was no help. . . . She is [status-post
radiofrequency] ablation of the [bilateral] L2-5
medial branch nerves completed 12/21/16 which has not
provided her with any significant relief thus far
however, she has noticed a significant increase in
muscle spasm since the procedure.

Administrative Transcript (hereinafter "Tr.") 1026. PA Landry

described the results of her examination of Jackson's lumbar

spine this way:

The patient is focally tender to palpation where there
are local taut bands of muscles located at the
bilateral lumbar paraspinal muscles at L5 level,
bilateral gluteal minimus, just lateral to the
superior aspect of the [sacroiliac] joints, and
bilateral gluteal maximus, just lateral to the
inferior aspect of the [sacroiliac] joints. These
areas represent local taut bands of muscle which
reproduce a snapping palpation and referred pain
pattern upon stimulation of each trigger point.

Id. at 1026-27.

Jackson returned to SPINE approximately 15 more times in

2017 for treatment of her back pain. Eight times, SPINE

providers who examined Jackson's back reported "local taut bands

of muscles." Tr. 996; see also Tr. 1000, 1003, 1007, 1010,

1018, 1023, 1025. Twice, those providers referred to pain

caused by muscle spasms. See Tr. 1018, 1022. From March of

2017 onward, Jackson was given prescriptions for diclofenac,

Amrix, Flexeril, tramadol, tizanidine, cyclobenzaprine,

amitriptyline, gabapentin, and Norco for her back pain,[2] was given trigger-point injections nine times, and was twice given a caudal epidural steroid injection ("caudal ESI").

On September 13, 2017, a SPINE provider reported that Jackson had recently canceled a scheduled caudal ESI because her back pain had responded well to trigger-point injections, <u>see</u> Tr. 1007, but a week later, she re-scheduled the caudal ESI, <u>see</u> 1004. Jackson received that treatment on October 3, <u>see</u> Tr. 1001, but it was only effective for a few days, <u>see</u> Tr. 997.

In November of 2017, Jackson had an MRI of her lumbar spine which showed "mild arthritis at L3-4 L4-5 and 5 S1 with a significant disc herniation migration of the disc up and left impacting the traversing S1 nerve root on the left." Tr. 997. During the office visit at which Dr. Holman reviewed Jackson's MRI with her, the two of them began discussing the possibility of back surgery.

---

[2] Diclofenac is a "nonsteroidal anti-inflammatory drug." <u>Dorland's Illustrated Medical Dictionary</u> 513 (32nd ed. 2012). Amrix, Flexeril, tizanidine, and cyclobenzaprine are all used to treat muscle spasms. <u>See id.</u> at 68, 455, 717, 1032. Tramadol is an "opioid analgesic used for the treatment of moderate to moderately severe pain." <u>Id.</u> at 1950. Amitriptyline is used to treat pain. <u>See id.</u> at 63. Gabapentin is "an anticonvulsant . . . used as adjunctive therapy in the treatment of partial seizures." <u>Id.</u> at 753. Norco is a "trademark for combination preparations of hydrocodone bitartrate and acetaminophen." <u>Id.</u> at 1290. Hydrocodone is a "semisynthetic opioid analgesic derived from codeine but having more powerful sedative and analgesic effects." <u>Id.</u> at 878.

In July of 2016, Jackson applied for DIB, claiming that she had been disabled since October 1, 2013, as a result of a fractured back, a torn disc in her back, severe facet damage in her spine, post-gastric sleeve complications, migraines, insomnia, radiculopathy in her toes and lower extremity, and Factor V Leiden disorder.[3]

Three days before she filed her application, Jackson had received an independent orthopedic medical evaluation, in connection with her workers' compensation claim, from Dr. Jonathan Sobel. Dr. Sobel's report included an opinion on Jackson's work capacity. On March 6, 2017, a state-agency medical consultant, Dr. Phyllis Sandell, reviewed Jackson's medical records and assessed her physical residual functional capacity ("RFC").[4]

On March 8, 2017, the SSA denied Jackson's application for DIB.

---

[3] Factor V Leiden is a "variant of the protein [factor] V (5), a clotting [factor]. . . . People who carry the [factor] V Leiden gene have a fivefold greater risk of thrombosis than the rest of the population." Stedman's, supra note 1, at 698. Thrombosis is "[c]lotting within a blood vessel . . ." Id. at 1985.

[4] "[R]esidual functional capacity 'is the most [a claimant] can still do despite [his or her] limitations.'" Purdy, 887 F.3d at 10 n.2 (quoting 20 C.F.R. § 416.945(a)(1), a regulation governing claims for supplemental security income that is worded identically to 20 C.F.R. § 404.1545(a)(1), which governs claims for DIB) (brackets in the original).

In April and May of 2017, PA Landry completed three New Hampshire Workers' Compensation Medical Forms for Jackson. In each one, she opined that Jackson had no work capacity. She also offered opinions on Jackson's capacity to perform several specific work-related activities.

In January of 2018, a physician's assistant, Dorothy McGrath, completed a Physical Impairment Medical Source Statement on Jackson. She opined that Jackson's pain or other symptoms would constantly interfere with the concentration and attention needed to perform simple work tasks and that Jackson was incapable of even low-stress jobs.

After the SSA denied Jackson's application for DIB, she requested and received a hearing before an Administrative Law Judge ("ALJ"). Before her hearing, she amended the date on which she claimed to have become disabled to October 1, 2015.

At Jackson's hearing, in January of 2018, she testified that her daily activities consisted almost exclusively of sitting in a recliner with a heating pad and shifting positions in an attempt to relieve her back pain. In addition to hearing from Jackson, the ALJ took testimony from a vocational expert ("VE"). The ALJ asked the VE what jobs could be performed by a person with the RFC that Dr. Sandell had ascribed to Jackson, and the VE testified that such a person could not do Jackson's previous work as a certified nursing assistant or her work as an

emergency-room technician, but could do Jackson's previous job as a medical assistant. Then, in response to a question from Jackson's counsel, the VE testified that all work would be precluded for a person with the RFC that Dr. Sandell assigned Jackson if that person "would experience pain or other symptoms that would interfere with [her] ability to stay on task greater than a third of an eight-hour work day." Tr. 63.

After Jackson's hearing, the ALJ issued a decision in which he determined that Jackson's lumbar degenerative disc disease and obesity were both medically determinable severe impairments but also found that none of Jackson's impairments, either alone in combination, met or medically equaled the severity of any of the impairments on the SSA's list of impairments that are per se disabling. Next, the ALJ determined that Jackson had an RFC consistent with Dr. Sandell's opinion. In support of his determination, the ALJ: (1) discounted claimant's statements about her symptoms; (2) gave partial weight to Dr. Sobel's opinions; (3) gave substantial weight to Dr. Sandall's opinions; (4) gave limited weight to PA McGrath's opinions; and (5) did not evaluate PA Landry's opinions. Based upon his RFC assessment and the testimony of the VE, the ALJ found that Jackson was able to perform her former work as a medical assistant. As a consequence, he determined that Jackson was not

under a disability from October 1, 2015, through the date of his decision, February 28, 2018.

### III. Discussion

A. <u>The Legal Framework</u>

To be awarded disability insurance benefits, a person must: (1) be insured for DIB; (2) not have reached retirement age; (3) have filed an application; and (4) be under a disability. 42 U.S.C. § 423(a)(1)(A)-(D). The only question in this case is whether the ALJ correctly determined that Jackson was not under a disability from October 1, 2015, through February 28, 2018.

To decide whether a claimant is disabled for the purpose of determining eligibility for DIB, an ALJ is required to employ a five-step sequential evaluation process. <u>See</u> 20 C.F.R. § 404.1520.

> The steps are: 1) if the [claimant] is engaged in substantial gainful work activity, the application is denied; 2) if the [claimant] does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the [claimant's] "residual functional capacity" is such that he or she can still perform past relevant work, then the application is denied; 5) if the [claimant], given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

Purdy, 887 F.3d at 10 (quoting Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001); citing 20 C.F.R. § 416.920, which outlines the same five-step process as the one prescribed in 20 C.F.R. § 404.1520).

At the first four steps in the sequential evaluation process, the claimant bears both the burden of production and the burden of proof. See Purdy, 887 F.3d at 9 (citing Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001)); see also Bowen v. Yuckert, 482 U.S. 137, 146 (1987). She must prove she is disabled by a preponderance of the evidence. See Mandziej v. Chater, 944 F. Supp. 121, 129 (D.N.H. 1996) (citing Paone v. Schweiker, 530 F. Supp. 808, 810-11 (D. Mass. 1982)).[5] Finally,

> [i]n assessing a disability claim, the [Commissioner] considers objective and subjective factors, including: (1) objective medical facts; (2) [claimant]'s subjective claims of pain and disability as supported by the testimony of the claimant or other witness; and (3) the [claimant]'s educational background, age, and work experience.

Mandziej, 944 F. Supp. at 129 (citing Avery v. Sec'y of HHS, 797 F.2d 19, 23 (1st Cir. 1986); Goodermote v. Sec'y of HHS, 690 F.2d 5, 6 (1st Cir. 1982)).

---

[5] At step five, the burden of proof shifts to the Acting Commissioner, see Seavey, 276 F.3d at 5 (citing Arocho v. Sec'y of HHS, 670 F.2d 374, 375 (1st Cir. 1982)), but the Acting Commissioner's step-five determination is not at issue here, so there is no need to describe the mechanics of step five.

B.  <u>Jackson's Claims</u>

Jackson claims that the ALJ erred by:  (1) improperly weighing the medical-opinion evidence; (2) improperly discounting her statements about her symptoms; and (3) failing to resolve a conflict between the VE's testimony and the Dictionary of Occupational Titles ("DOT").[6]  Jackson's second claim is persuasive and dispositive.

At her hearing, Jackson testified that her back pain was so severe that her daily activities were effectively limited to sitting in a recliner with a heating pad and trying to find a comfortable position.  In his decision, the ALJ provided a more expansive description of Jackson's symptoms:

> The claimant alleged that she is unable to work due to intense, chronic low back pain.  She alleged that sitting, standing, or being in one position for more than 20 minutes is very painful.  She alleged that she is treated with caudal injections and is followed by a pain specialist but that despite treatment, she experiences loss of sensation in her left leg at random times.  She alleged that she had to make modification to her home due to these symptoms, including installing a handle in the shower and handrails around the porch and deck.  She alleged that she bought a shower chair, a new mattress, a reclining chair, and a special pillow to alleviate pain, and that she must also use a heat pad. . . .  She stated that she must have help dressing and that she must

---

[6] "The DOT is published by the United States Department of Labor, and the SSA regulations designate it as a source of vocational evidence for use in making disability determinations."  <u>Regalado v. Colvin</u>, No. 15-cv-299-PB, 2016 WL 4775525, at *4 n.7 (D.N.H. Sept. 14, 2016) (citing 20 C.F.R. § 404.1560(b)(2)).

wear slip-on shoes due to difficulty bending over. The claimant testified that her husband and daughter must perform all household chores.

Tr. 22. After describing claimant's statements about her symptoms, the ALJ gave the following explanation for his decision to discount them:

> The Regulations provide that an individual's statement as to pain or other symptoms is not sufficient to establish the existence of a physical or mental health impairment or that an individual is disabled. There must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could be reasonably expected . . . to produce the pain or other symptoms alleged. The objective evidence in this claim falls short of demonstrating the existence of pain and limitations that are so severe that the claimant cannot perform any work on a regular and continuing basis. The claimant testified to an extremely limited range of functional abilities. However, the objective medical evidence of record does not fully support those allegations. Therefore, because the claimant has failed to establish a correlation between the allegations and the objective medical evidence, the undersigned finds the claimant's symptom[s] are not supported to the extent alleged.

Tr. 23 (citations omitted).

There are several problems with the ALJ's analysis. In the discussion that follows, the court begins by setting out the applicable legal principles and then turns to the ALJ's application of those principles.

1.  <u>Legal Principles</u>

The SSA regulations "define a symptom as [an] individual's own description or statement of his physical or mental impairment(s)." Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029, at *2 (S.S.A. Mar. 16, 2016) (citing 20 C.F.R. § 404.1528(a) (2015 ed.)).  But, as the ALJ correctly pointed out in his decision, "an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability," <u>id.</u>  Rather, when "an individual alleges impairment-related symptoms, [an ALJ] must evaluate those symptoms using a two-step process."  <u>Id.</u>

Step one is to determine whether the claimant has a medically determinable impairment that could reasonably be expected to produce her alleged symptoms.  <u>See</u> SSR 16-3p, 2016 WL 1119029, at *3.  If so, the second step is to evaluate the intensity and persistence of the claimant's symptoms and determine the extent to which they limit her ability to perform work-related activities.  <u>See</u> <u>id.</u>

Step two, in turn, consists of two parts.  The first part of step two requires an ALJ to determine whether the claimant's alleged symptoms are consistent with the objective medical evidence.  If so, then the claimant's statements should be credited, and a finding of disability may be in order.  <u>See</u> SSR 16-3p, 2016 WL 1119029, at *4, *5.  However, an ALJ cannot

"disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms [she] allege[s]." Id. at *5 (citing 20 C.F.R. § 404.1529(c)(2)).  To the contrary, when a claimant's statements about her symptoms are not substantiated by objective medical evidence, the ALJ must perform the second part of step two by considering other evidence in the record, including "statements from the individual, medical sources, and any other sources that might have information about the individual's symptoms, including agency personnel, as well as the factors set forth in [the SSA's] regulations." SSR 16-3p, 2016 WL 1119029, at *5.  The factors mentioned in SSR 16-3p are set forth in 20 C.F.R. § 404.1529(c)(3), and they are often referred to as the Avery factors, see 797 F.2d at 29.  The Avery factors include:

    1. Daily activities;

    2. The location, duration, frequency, and intensity of pain or other symptoms;

    3. Factors that precipitate and aggravate the symptoms;

    4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;

    5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

SSR 16-3p, 2016 WL 1119029, at *7.

### 2. Application

As the court has noted, there are several problems with the manner in which the ALJ discounted claimant's statements about her symptoms.

First of all, notwithstanding the fact that the ALJ correctly described the applicable two-step analytical process in his decision, he did not clearly indicate how far he went with it. While the court harbors a concern that the ALJ did not get past step one,[7] which would be reversible error,[8] Jackson

---

[7] The ALJ's decision could be read as concluding the analysis at step one because the ALJ: (1) stated the step-one rule that the existence of an impairment that could produce alleged symptoms must be demonstrated by medical signs and findings; and (2) immediately concluded that the objective medical evidence in this case was insufficient, see Tr. 23.

[8] That is because the record in this case contains "objective medical evidence [such as Jackson's 2017 MRI] from an acceptable medical source [that] establish[es] the existence of a medically determinable impairment that could reasonably be expected to produce [Jackson's] alleged symptoms," SSR 16-3p, 2016 WL 1119029, at *3, which required the ALJ to make an affirmative finding at step one and move on to step two.

does not claim that the ALJ committed such an error, so the court will proceed as if the ALJ did not stop at step one.

However, Jackson does claim that the ALJ erred by performing only the first part of step two when he should have performed both parts.  Jackson's claim is supported by the ALJ's statement that "because the claimant has failed to establish a correlation between [her] allegations and the objective medical evidence, the undersigned finds [her] symptom[s] are not supported to the extent alleged."  Tr. 23.  Because that statement says nothing about any of the "other evidence" that an ALJ must consider when performing the second part of step two, it would be fair to read his decision as concluding with the first part of step two, which would also be a reversible error. See Martin v. Berryhill, No. 18-cv-461-JL, 2019 WL 1987049, at *5 (D.N.H. May 6, 2019) (remanding, when ALJ "relied solely upon the lack of objective medical evidence to discount the limiting effects of [claimant's] alleged symptoms").  For her part, the Acting Commissioner argues that the ALJ did move on to the second part of step two and identifies several forms of "other evidence" that the ALJ discussed elsewhere in his opinion, including claimant's activities of daily living and her treatment history.  While the ALJ could have been clearer in his discussion of step two, the court will presume that he did, indeed, perform both the first and second parts of that step.

Even so, this case must be remanded because the ALJ's reliance upon claimant's daily activities and treatment history to discount her statements about her symptoms is not supported by substantial evidence.

The ALJ's discussion of claimant's symptoms consists largely of a chronological narrative that focusses on: (1) Jackson's 2012 workplace injury and her subsequent medical treatment, see Tr. 24; (2) a physical examination she had in March of 2015, see Tr. 24-25; (3) her 2016 evaluation by Dr. Sobel, see Tr. 25; and (4) the medical treatment she received after a trip-and-fall accident in 2017, see Tr. 25-26. The bulk of the ALJ's discussion consists of descriptions of objective medical evidence, but in describing the aftermath of Jackson's 2012 workplace injury, he provided some evidence of claimant's daily activities and at several points, he referred to forms of treatment Jackson had received. However, the ALJ erred by relying upon that evidence to support his decision to discount claimant's statements.

Jackson's primary objection to the ALJ's assessment of her statements about her symptoms is his heavy reliance upon evidence of daily activities she engaged in before the date on which she claims to have become disabled, i.e., her alleged onset date. That criticism is well founded.

In the paragraph the ALJ devoted to the aftermath of Jackson's 2012 workplace injury, he had this to say:

> During this period, the claimant was reportedly able to travel out of state to care for an ill family member and to go on vacation, despite her reports of intense back pain. She also reported that she was able to exercise for weight loss on the days that she was not working. . . . [I]n June 2014 . . . she . . . told her doctor that she had gotten a new German shepherd puppy and was looking forward to doing some gardening as well as being active with the dog. Elsewhere she reported that she exercised on a regular basis and that she had two puppies who were a lot of work. The undersigned notes that this evidence is not fully consistent with her allegations of debilitating, persistent pain that limits her to lying on a heating pad most of the day, as she alleged at the hearing.

Tr. 24 (citations to the record omitted).

The hearing at which claimant made the statements at issue took place in January of 2018. The out-of-state travel to which the ALJ referred took place from 2004 to 2006. See Tr. 424, 425, 427. Jackson reported that she was able to exercise on days she was not working in June of 2013. See Tr. 438. She reported that she was "trying to exercise on a regular basis," Tr. 576, in April of 2015. She told her doctor that she had two puppies in September of 2015. Her alleged onset date is October 1, 2015.

Plainly, it is up to the ALJ to resolve conflicts in the evidence. See Purdy, 887 F.3d at 13. And substantial-evidence review is highly deferential. See id. But reports that Jackson made to her doctors about her daily activities between 2004 and

2015 are not evidence a reasonable mind could accept as adequate to support a finding that Jackson's testimony about her symptoms in 2018 was contradicted by evidence of her daily activities. In other words, the ALJ's finding that Jackson's statements were undermined by her daily activities is not supported by substantial evidence.  See Purdy, 887 F.3d at 7 (defining "substantial evidence" as evidence a reasonable mind could accept as adequate to support a conclusion).

Apart from non-contemporaneous evidence about daily activities and objective medical evidence, the only other evidence the ALJ cited in support of his decision to discount Jackson's statements about her symptoms consists of medical records documenting the treatment she received for her back condition.  With reference to the treatment Jackson received in 2017 and its efficacy, the ALJ said this:

> She underwent a trigger point injection and her doctor prescribed a trial of gabapentin.  She continued to report significant symptom improvement with treatment and canceled a scheduled caudal epidural steroid injection in August 2017 due to improvements in overall pain levels and functioning.

Tr. 25 (citations to the record omitted).  The ALJ's decision does not say so directly, but it may be construed, favorably to the Acting Commissioner, as discounting claimant's statements about her symptoms either because she did not receive very much treatment for her back pain or because the treatment she did

receive had been largely effective.  Neither conclusion is
supported by substantial evidence.

While the ALJ said that Jackson "underwent a trigger point
injection," Tr. 25 (emphasis added), the record shows that
between March 10 and November 27 of 2017, she had nine trigger
point injections.  And while the ALJ said that Jackson's doctor
prescribed a trial of gabapentin, the record shows that between
March 8 and November 27 of 2017, Jackson was given prescriptions
for diclofenac, Amrix, tizanidine, tramadol, amitriptyline,
gabapentin, Norco, cyclobenzaprine, and Flexeril for her back
pain and muscle spasms.  Finally, while the ALJ said that
Jackson "canceled a scheduled caudal epidural steroid injection
in August 2017," Tr. 25, suggesting that she had no need for
that form of treatment because her condition had improved, the
record shows that Jackson:  (1) had a caudal ESI in June of
2017; (2) canceled a scheduled caudal ESI in August; (3)
rescheduled that procedure in September; (4) had it in October;
and (5) got no appreciable relief from it.

The ALJ's handling of claimant's 2017 treatment records
adds up to reversible error.  As Judge Talwani has recently
explained:

> Although an ALJ need not address all evidence in the
> record, and the failure to mention evidence is
> insufficient to show that the ALJ did not consider it,
> N.L.R.B. v. Beverly Enterprises-Massachusetts, Inc.,
> 174 F.3d 13, 26 (1st Cir. 1999), an ALJ may not

cherry-pick evidence to support his or her findings without referencing contradictory evidence. Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999).

Ares v. Berryhill, No. 16-cv-11439-IT, 2017 WL 5484674, at *5 (D. Mass. Nov. 15, 2017); see also Bell v. Astrue, No. 11-cv-45-PB, 2012 WL 124841, at *10 (D.N.H. Jan. 17, 2012) (remanding where ALJ "cherry-pick[ed] evidence from the record to support his conclusion . . . without acknowledging conflicting evidence").

Here, given the discrepancies between the ALJ's characterization of Jackson's 2017 treatment and her 2017 treatment records, the best that can be said of the ALJ's analysis is that he selectively focused on evidence of:  (1) one trigger-point injection, without referencing evidence of eight others; (2) a prescription for one medication, without referencing evidence of prescriptions for eight others; and (3) a canceled caudal ESI, without referencing Jackson's subsequent rescheduling of that same treatment and its ultimate ineffectiveness.  The ALJ's handling of the evidence generated by claimant's 2017 medical treatment is another reason for remanding this matter.

In sum, this case must be remanded because of the errors the ALJ made in using evidence of Jackson's daily activities and her treatment history as a basis for discounting the statements she made about her symptoms.

3. <u>Other Issues</u>

While the ALJ's handling of the evidence related to claimant's statements about her symptoms is enough to require a remand, the court takes this opportunity to make the following observations, which may be of use on remand.

First, as the court has noted, the ALJ's findings at step one of the two-step analytical process are both unclear and potentially problematic. With regard to the proper mode of analysis at step one, SSR 16-3p explains:

> In determining whether there is an underlying medically determinable impairment that could reasonably be expected to produce an individual's symptoms, [the ALJ does] not consider whether the severity of an individual's alleged symptoms is supported by the objective medical evidence. For example, if an individual has a medically determinable impairment established by a knee x-ray showing mild degenerative changes and he or she alleges extreme pain that limits his or her ability to stand and walk, [an ALJ should] find that individual has a medically determinable impairment that could reasonably be expected to produce the symptom of pain. We will proceed to step two of the two-step process, even though the level of pain an individual alleges may seem out of proportion with the objective medical evidence.

2016 WL 1119029, at *3 (emphasis added). But here, rather than explicitly saying whether or not Jackson had a medically determinable impairment that could reasonably be expected to produce her symptoms, the ALJ found "that claimant does have underlying medically determinable impairments that could

reasonably cause some symptomatology," Tr. 23 (emphasis added),

and then he continued:

> [T]he pivotal question is not whether such symptoms
> exist, but whether those symptoms occur with such
> frequency, duration or severity as to reduce the
> claimant's residual functional capacity as set forth
> above or to preclude all work activity on a continuing
> and regular basis.

Id. Based upon the above-quoted language from the ALJ's

decision, it would appear that he did precisely what SSR 16-3p

cautions against, i.e., considering the severity of Jackson's

symptoms at step one.

The ALJ may also have erred at step two of the analysis

when he stated that "[t]he evidence fails to document that the

claimant has demonstrated most of the signs typically associated

with chronic, severe pain, such as muscle atrophy, spasm,

rigidity, or tremor," id., and that "[i]maging studies have

failed to reveal significant pathology in the lumbar spine," id.

While the ALJ found that the record did not adequately

document signs typically associated with pain, Jackson's SPINE

providers:  (1) noted muscle spasms in two 2017 progress notes;

(2) prescribed four different medications used to treat muscle

spasms; and (3) noted muscle rigidity in nine 2017 progress

notes.  For his part, the ALJ acknowledged Jackson's primary

care provider's finding of muscle spasms, but did not mention

the two similar findings by Jackson's SPINE providers or the

medications she had been prescribed for that condition. Furthermore, the ALJ did not mention any of the nine times in 2017 that SPINE providers reported muscle rigidity. The ALJ's handling of that evidence is suspect, for reasons the court has already explained. See Ares, 2017 WL 5484674, at *5; Bell, 2012 WL 124841, at *10. In addition, while the ALJ found that imaging studies revealed no "significant pathology in the lumbar spine," Tr. 24 (emphasis added), Jackson's November 2017 lumbar-spine MRI revealed "a significant disc herniation migration of the disc up and left impacting the traversing S1 nerve root on the left," Tr. 997 (emphasis added). The basis for the ALJ's finding that a significant disc herniation was not a significant pathology is not apparent from his decision.

In short, the ALJ's step-one finding and his handling of the first part of step two should probably be revisited on remand.

## IV. Conclusion

For the reasons detailed above, the Acting Commissioner's motion for an order affirming her decision[9] is denied, and Jackson's motion to reverse that decision[10] is granted to the extent that this matter is remanded to the Acting Commissioner,

---

[9] Document no. 8.

[10] Document no. 6.

pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings consistent with this order.  The clerk of the court shall enter judgment in favor of Jackson and close the case.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  June 7, 2019

cc:  D. Lance Tillinghast, Esq.
     Hugh Dun Rappaport, Esq.